21-1251 Rocky Mountain Gun Owners v. Polis. May it please the court. I'm Shannon Stevenson, Solicitor General on behalf of Governor Polis. The question presented here is whether plaintiffs can get a preliminary injunction on a Second Amendment challenge without putting any evidence regarding historical understanding into the record. The answer is no. At Bruin Step 1, plaintiffs have the burden to show that the public understanding of the Second Amendment at the founding covered their proposed conduct. I think you're conflating prongs one and two of Bruin. As I read Bruin, the first step is whether the activity involved is covered under the the persons involved are part of the people. I agree with you. And then we get into the second prong and we're in a historical undertaking about what kind of restrictions existed at the founding and maybe but not clearly at the time of the passage of the 14th Amendment. So, if you look at the Supreme Court's analysis under prong one with respect to weapons, guns, it makes very clear under prong one we're not frozen in time. Would you agree with that? I agree that Heller addressed that specific question and said yes. With respect to firearms, we are not frozen in time. But you would argue that with respect to the people, we are frozen in time. Well, I think we have a couple of arguments with respect to the people. Well, answer that first. Are we frozen in time? I think we have no indication that we are not frozen in time. Well, then I can't own a gun. You can't own a gun, right? We're not protected by the Second Amendment because we're female. With respect to the sort of odious classifications, as I think they call them, that existed at the time of the founding, I think those are a little bit of a red herring because the 14th Amendment, the guarantee of equal protection, I think cures some of those problems. And of course, age has never been treated in the same way as distinctions drawn on race or gender and things like that. And I think to come to that question about the people, the corresponding problem on the other side is that if we say it's all people, then we have the problem of children of all different rights. And I don't think anyone is seriously advocating that 5-year-olds or 10-year-olds were ever understood at the time of the founding or ever to have the right to keep and bear arms. Yet. Fair enough. So, and just to take a step back, because I agreed with your summary of Bruin's step one, which is we have to look at the conduct. And it's the plain text of the Second Amendment. But as understood at the time of the founding, is that conduct, was that conduct understood to be protected by the Second Amendment? And I think we have to look at the conduct and then, as you said, at the people, too. But here, because the conduct is only with respect to certain people, I think the conduct prong really resolves this question and the fact that the plaintiffs have put forward no evidence to show that 18- to 20-year-olds were ever understood at the time of the founding to have Second Amendment rights. Their only argument on this point was that they had an implied right, just looking at the plain text, that the right to keep and bear must necessarily include the right to acquire. That's their exclusive argument based on prong. Okay, so you're focusing on the right to acquire now as opposed to 18- to 20-year-olds. So I think you have to look at them both together when you look at the conduct, because that's all that the Colorado statute regulates. We only limit the right to purchase, not to own or possess, only the right to purchase for 18- to 20-year-olds. And so that's the conduct that we have to look at at step one. Isn't that kind of like when, I'm trying to remember which justice it was, said it doesn't do you any good to have a right to bear arms if you can't also buy bullets? I know it was Justice Thomas, actually. So and I think the issue here is we have to come back to what does Bruin tell us to do with respect to figuring out what conduct is swept in and is protected by the Second Amendment? And we have to look at what the historical understanding was. And both with respect to 18- to 21-year-olds and with respect to acquisition, the plaintiffs have put forward nothing, no evidence to show that a right to acquire generally or a right to acquire specifically by that age group. And of course, on the other side, the governor has put in hundreds of pages of expert testimony explaining that 18- to 20-year-olds at the time had no rights whatsoever. So again, on the... Isn't the logical extension of your argument that if the prohibition is on the acquisition and your statute relates only to 18- to 21-year-olds? And only certain acquisitions. Right. But isn't the logical extension that a state could pass a law prohibiting purchase by any person because it's not covered by the Second Amendment purchases? So Your Honor, I think what you would look to in that case, I think the answer is likely no. But I think the way you would go about figuring that out is to have the plaintiffs come forward with evidence that at the time of the founding, the public understanding was that there were rights to acquire weapons. I don't know what that record would look like. They haven't developed it. But I think that's what you would want to develop in that case. And if you could show that and show that the government couldn't get over step two, then it wouldn't... That the government wouldn't prevail on that issue. If you read Bruin and Heller, it appears that what we're being told is that step one, the presumption is you're within the people and you've got to show something to suggest that you're not, not the other way around. So what I will say, and I will grant you, I think this issue of the who is the people is a hard one and I don't think this court needs to resolve it to reverse this preliminary injunction. But, and they use all kinds of words to describe who the people are, right? It's all the people, it's adult citizens, it's responsible law abiding citizens. We don't have a great pen down definition. And so I think what we have to do is look at Bruin and say, what does Bruin tell us about how we figure out who the people were for purposes of the second amendment? And sorry to sound like a broken record, but we come back to what was the evidence at the time of what the public understood, who the people were, who were protected by the second amendment. On the plaintiff's side, they have nothing to show that 18 to 20 year olds were viewed as being protected by the second amendment at that time. On the other side... What do you do about the Militia Act? Where not only were they permitted, they were ordered to bring a gun and come join the Militia. Right. So I think there's two problems with the Militia laws. The first is just a logical problem. On their face, the Militia laws conscript people into government service and order them to come to certain Militia service with a certain weapon. So on its face, we're talking about statutes that compel you to do something, you're ordered by the government to do it. So on its face, I don't think that those statutes say anything about what were the rights of those people to go out and acquire guns for other reasons and other purposes. They're just apples and oranges and you can't conflate the two. Well, it's some indication that they didn't have a problem with 18, 19, and 20 year olds having guns. Right. I agree, Your Honor. I think there was no problem with 18, 19, and 20 year olds having guns at the time. The question is, what was the view of what the public understood the second amendment of their rights to protect? Yes, they had guns, but does that mean they had a constitutional right to have them? And again, I'm back to the evidentiary point here. The governor has put in hundreds of pages of expert opinion explaining why those Militia, specifically why those Militia laws did not generate any public understanding of rights in that age group to acquire weapons. Well, if... And the plaintiffs have nothing on the other side. If I'm reading Bruin correctly, which maybe I'm not, and you have to look under stage one, you have to bring it forward historically so that the people can include non-white property owners, right? It seems to me that the history isn't as helpful of what happened then as today, how we treat an 18, 19, or 20 year old. So I think I disagree with you on Bruin's step one, Your Honor. I do think that analysis is confined to the public understanding at the time of the founding. And I agree with you, there is some... Well, the public understanding at the time of the founding was white property owners had a right to bear arms. Well, that would be true, but I don't know. Again, we don't have a record put forward by the plaintiffs saying that it was limited to that. There might have been more people included in that, but we don't have that record in front of us. And just to make a point on this evidentiary record issue, if you look at Bruin footnote six, it is clear that these questions are to be decided on an evidentiary basis with deference to the rules of evidence and based on party presentation principles. So again, when we're looking at what is the record that the plaintiffs have given us on who was covered by the second amendment at the time of the founding, based on what type of conduct was, they have just put forward nothing. And here, I think that's dispositive given this procedural posture. Can you read Heller and Bruin in step one still? If there's a presumption that the people includes all the people, as Heller says, is that same presumption applied to the keep and bear, which is really the conduct, I think, at issue in this law is the commercial transaction to acquire. Do we apply that same presumption to that language? No, Your Honor. I think the people and the conduct are two separate issues. And again, when Heller was talking about the people and doing that analysis, I just want to be clear, it was very focused on this distinction of, were the people only the militia? And it really wasn't looking at other categorizations of people. And so I think we have to be careful not to overread Heller in that regard. But I think the people is one question, and I think the conduct is a separate question. And I think the conduct one is the easier one here and one that necessitates reversal of the preliminary injunction just on its own. And just to come back quickly to Bruin footnote six and the party presentation principles, I do think it's really important that the plaintiffs have to put forward a record here. I think what they've tried to do in their arguments is bootstrap in evidence from other district court and circuit court decisions, and I think that's not appropriate. I don't think citations to law review articles are appropriate evidence for the court to put forward, especially on step one, where their sole argument is based on an implied right to require, which an implied rights analysis is not even contemplated by Bruin. They just failed that test. And with the court's permission, I'd like to reserve the balance of my time for rebuttal. Thank you. May I please report, my name is Barry Errington, and I'm representing the plaintiffs in this case. With respect to this issue of the people, the Ninth Circuit absolutely nailed it just last week in a case called United States v. Duarte, 2024, WL-206-8016 at night. This is a Ninth Circuit decision, May 9th, 2024. And I will quote from that, Duarte, who is the criminal defendant in that case, is one of the people because he is an American citizen, citing Heller. Heller resolved this textual question when he held that the people includes all Americans because they fall squarely within our national community. The court went on to say, well, let me back up. Heller had said that at the first step, what Bruin later called the first step, the textual step, you interpret the words of the Second Amendment based upon the original public understanding. And how do you do that? Well, you look at what Heller looked at. You look at dictionaries from... This defies literalism, doesn't it? Because the Second Amendment doesn't say American citizens, it says people. Well, and Heller said that that means, the phrase, the people means all Americans. Duarte says that. Heller said that too. Duarte was quoting Heller. Heller said the word, the people means all Americans. And then it went on to say, not some unspecified subset. So according to that, that just nails it back to Heller. You don't need Duarte. You don't need Duarte. I'm just saying that Duarte got it right. And I would ask the court to follow that precedent. Well, what about keep and bear? We're talking about the people, the presumption. What's your position on where we can look to to establish that your burden on Bruins step one, that keep and bear, the right here to engage in a commercial transaction, to acquire a firearm, that there is evidence in this record, or that we can look to to determine that question in your client's favor? So first of all, I would say it is... And here's where the state and the plaintiff's heart company emphatically. Bruins step one is not an evidentiary question. It is a textual question. The only evidentiary question occurs at Bruins step two. At Bruins step one, what do the words mean? That's not an evidentiary issue. And Heller also addressed this. It says to have means to keep and bear arms. To keep arms means to have arms. It's just a plain text sort of analysis. And stepping up and using that exact same analysis, we would ask the court to follow the Third Circuit recently from Laura, who said to have means to acquire. Because if you can't acquire, you can never have. It is... One is subsumed within the other. And that's not an unusual analysis. Laura follows in the tradition of several other cases. Don't we just get all tied in knots when we talk about textualism and literalism, and then we talk about an implication of a right to purchase if you have the right to bear arms? And so... And even with the concept of American citizens. I mean, you know, you say stick to the text. All right. Let's do that. And so Heller says stick to the text. And when it says stick to the text, Heller didn't say that these words are self-defining. Heller went about in a very systematic way of talking about what they meant in the original public understanding in the late 1700s. And it went... And how did it do that? It went back to dictionaries from the late 1700s. And it says what did arms mean in the late 1700s? Decided dictionaries. What does have mean? What does bear mean? All of these words are not self-defining. And if someone is suggesting that textualism or original public understanding means, well, the words of the Constitution are self-defining and we don't have to look to dictionaries, I don't think that that's what Heller or Bruin stand for. And so let's talk about the issue of commercial transactions. The state relies heavily upon its power to regulate commercial transactions, saying these are just commercial transactions. And they also tie that to Heller by saying one of the traditional categories that Heller at least said we're not interfering with was the right to regulate the sales, right? And so I think it's important to say that that was not a holding of Heller. It was dicta in Heller, and... Well, this circuit at least follows dicta from the Supreme Court as much as we follow the holding. So I'm not sure that's very helpful. But I understand the court's point. But what was Heller really saying? It was a throwaway comment, a sentence or two. It was not a heavy analysis. It basically said nothing we say here today is going to cast doubt upon these sorts of regulations that we presume to be constitutional. It was not establishing a legal presumption. It was saying, you know, if when the time comes, we presume these will pass the test. And one of those was commercial transactions, that we believe that regulations of commercial transactions are probably going to be constitutional, is all Heller was saying. And that's true. Regulations of commercial transactions are probably going to be constitutional in the broad sense. But that doesn't get the state home here because for two reasons. First, this is not primarily a regulation of commercial transactions. Primarily, it is a bar of a purchaser. So it says 18 to 20-year-old adult citizens cannot purchase these arms. That's not a regulation of a commercial transaction in any sense of the word. That's a regulation barring a person from purchasing. Now we'd also point to Hirschfeld, which said, you know, when Heller was talking about commercial transactions and regulations, what he was talking about is the hoops that states can ask sellers to jump through before they sell a gun to a person. Well, this is not a hoop that someone can satisfy. This is an absolute bar. There is nothing an 18 to 20-year-old can do to jump through any hoop to get to a place where they can purchase these transactions. It's a categorical prohibition on purchase, not mere regulation of commercial transactions. But you're focusing on the buyer. Yes, sir. And so does the statute. The statute makes it illegal to purchase. And it also makes it illegal to sell. It also makes it illegal to purchase. Well, what about focusing on that? Isn't that a commercial regulation? Well, so just calling something a commercial regulation is the same question that you raised earlier, Your Honor. We can't just say, well, it's a commercial regulation. We can prohibit everybody from purchasing. We can regulate. We can prevent. No, no, no, no, no. It says, well, OK, but this statute limits it to 18 to 21 years. So what's to prevent it from limiting it from 18 to 61? Because that would be unconstitutional. Because there is no history and tradition of allowing. Well, that was the response, the exact response the state gave. There is a historical analog that adults could purchase. Well, in the founding era, the state concedes that there was absolute zero regulation of 18 to 20-year-olds purchasing firearms. There was no ban. And there was nothing short of a ban in terms of a regulation. Well, there's no ban on five-year-olds, either, that anyone can point to. That's true. And if a five-year-old were the plaintiff, you would say, OK, what's the historical tradition of preventing five-year-olds? And there isn't. So under Bruin, does that mean no state can restrict five-year-olds from purchasing firearms? No. Why not? Because when you look at the historical tradition from the founding era, there was a line. And in 1791, the line was clearly 18, at which people were deemed to be mature enough to be required to have arms. No, to be required to join the militia. That's right. Just because they didn't require five-year-olds to join the militia doesn't tell me anything about whether there's historical support at the time of the founding of prohibiting five-year-olds from buying arms. And of course, the court can't look at what was there. Was there at the time of the founding? And there is no indication that any state was going to require five-year-olds to come in and serve in the militia. But why would we anticipate seeing a regulation of activity that didn't really exist at the founding? And now I'm not talking about five-year-olds. Let's go to the militia service. So 18 would be the line of demarcation requiring militia service in a lot of states. But as I read the state's record here, there's ample evidence they suggest to say that the firearms were provided to those 18-year-old militia members from the families. Because those 18, 19, 20-year-olds did not have, did not engage in the practice of acquiring the firearms themselves. And it was commonly understood that until you were 21, you would not be out purchasing a firearm from a gunsmith or someone who's manufacturing those. So why would we regulate something that wasn't even in existence at that time? And so the answer is there were a few, a very few regulations at the founding requiring parents to provide their sons with firearms. Now, this was not, none of those regulations prohibited their sons from buying the firearms themselves. They required the parents to buy the firearms. And why did they do that? Probably because firearms are expensive. And when you're going to require a man to come in and bring his own firearm, you're not going to require him to do something that he can't afford. And so they required his parents to help him. And of course, that is only three or four of those. But the vast majority of the statutes did not have the parent requiring parents. Well, why isn't that enough? I mean, what's the quantum of proof required when we look back at historical antecedents to say, well, that was being regulated at the founding? Bruin provides this when it says there has to be a widespread, enduring, nationwide tradition. Three or four. Bruin said three, for example, was not enough. And so in terms of the regulations at the founding, there were zero. And zero bans, zero regulations. And what do we do about the historical record when you look to after the Civil War and you have the 14th Amendment, I guess the second founding, as it's sometimes called? How do we look at that? So the district court got this exactly right. Bruin itself said it is generally understood. It noted a scholarly debate about the impact of 1868. But it said it's generally understood that the rights are pegged by the people who adopted them. And that was in 1791. Now, what I think is absolutely dispositive on this is that if you go the other way, you violate MacDonald and Bruin, who both said that when you're interpreting the right to keep and bear arms, you have to interpret it identically for the states and the federal government. And if you're going to say that the 14th Amendment, which applies to the states, is going to have a different rule from the federal government, that's going to violate that rule. And I also think that Espinoza versus Montana is utterly dispositive on this issue, where there was a tradition of First Amendment aid at the founding. And in the late 1800s, 30 states had passed no-aid provisions. And what did Espinoza say? That 30 states passing regulations that conflicted with the original understanding in 1791, not enough. Now, the state says there were 19 states. Plaintiffs disagree for the reasons set forth in district court's opinion and in our brief that there were 19 states. For one thing, none of those states prohibited people, anybody, 18 and above, from purchasing long arms. And that's what we're talking about here. The states, as a practical matter, is prohibiting people 18 to 20 from purchasing long arms. And they're saying that these statutes from the late 19th century are analogous. Well, how is that possible when none of them prohibited the purchase of long arms by anybody? Counsel, briefly, on the injunction, the four factors, the last one, why would we not conclude that the public interest factor here favors the state when we're talking about a law passed by their duly elected representatives and signed into law by their governor? Because this court has held over and over and over again that if you get to the merits, and the merits say they're probably going to win on the merits, the state has no interest in enforcing an unconstitutional law. You're asking, doesn't that collapse that into the merits of termination? And lots of courts have said that it does. Thank you, Your Honor. Thank you. So I want to move forward to Bruin's step two, because I think we win independently on that grounds, too. And I think that the plaintiffs more or less conceded that if you consider all of those dozens and dozens of laws that prohibited 18- to 20-year-olds from accessing weapons that were enacted from the time of the Civil War up to the early 1900s, that if you consider that information, then we win. And that the only way that they can prevail on that is to say, don't look at that at all. And the only way they can say, don't look at that at all, is if they show that it contradicts earlier history. And that's the piece that they're missing, because there is no earlier history that had showed any clear right of 18- to 20-year-olds to access and purchase firearms. Again, all of the record shows. But that assumes that you're reading Bruin to say, on step two, what you're looking at is whether it's silent. But what Bruin says is you're looking to see whether there were historical restrictions. So a finding that there were no historical restrictions is evidence against you, not for you. So I disagree with that, Your Honor. You can look at all of the evidence, I think, is what we do. And we look at all of his laws. Well, I'm not sure we look at all the evidence. I mean, Bruin says we're not going to decide what you look at. But then three times says, but we really look at it at the time of the founding. And we only look at the 14th Amendment time period if it is the same, it is consistent with. I guess I would say it's slightly different in that it doesn't contradict what came before. And here, there is no contradiction, because there was no right of 18- to 20-year-olds back at the founding time to go out and purchase firearms. They had no rights at all. And so the fact that they were then later specifically regulated and prohibited from purchasing weapons isn't a contradiction, and it doesn't conflict. It's a continuation of the same history from the founding. And therefore, you can and should consider it. And it establishes this nation's overwhelming and consistent history of regulating the access to firearms and other weapons for this particularly sensitive age group. And then just to come back quickly to the plain text point that my opponent made, keep and bear arms was exhaustively those words, just the pure plain text, exhaustively considered in Heller and Bruin. And not only did they not say that includes a right to acquire it, they have numerous comments suggesting that the right to acquire weapons is that regulations on that are presumptively lawful. Indeed, this concurrence in Bruin, Justice Alito specifically called out the federal handgun ban for purchasers under 21. Thank you. Thank you. Thank you for the briefing in this matter and for the argument today. And we will take it under advisement.